FILED & ENTERED

DEC 21 2021

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY egonzale DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SAN FERNANDO VALLEY DIVISION

In re:

Holly Elizabeth Winzenburg

Debtor(s).

Case No.: 1:13-bk-16084-VK

CHAPTER 7

**MEMORANDUM OF OPINION ON LIABILITY OF ERIC GANS FOR VIOLATION OF THE DISCHARGE INJUNCTION**

Date:      November 23, 2021
Time:      9:00 AM
Courtroom: 303

    The dispute that led to this evidentiary hearing arises from a post-discharge delay in the release of a judgment lien on the home of Holly Elizabeth Winzenburg, the debtor in this case.  Although there are some dates and facts in dispute, most of the critical ones are easily ascertained.  The contentions of the various attorneys concerning their acerbic relationship are not readily determined and are actually largely irrelevant to the legal question at hand.  That question falls into two parts: (1) did Eric Gans intentionally delay in releasing the judgment lien of the Gans Estate and (2) did he demand and receive $1,000 as payment on the discharged debt as a prerequisite to his release of the lien?

## FINDINGS OF FACT

2009-10. Carl Gans was the attorney for Ms. Winzenburg in her divorce case. He withdrew when she owed him $25,000 in fees. Although Ms. Winzenburg asserts that Carl Gans agreed to forgive the balance due if she would pay him $2,500, this is irrelevant because the payment was never made.

Carl Gans passed away and his son Eric Gans (herein referred to as "Gans"), a relatively new attorney, handled the Gans Estate of which his mother is the primary beneficiary.

5/28/13 – The Gans Estate files its collection action in the Santa Barbara Superior Court, case 1417303. Although there is a contention that this was filed in the wrong county because Ms. Winzenburg lived in Ventura County, the judgment itself has never been attacked and it was known to Ms. Winzenburg and her bankruptcy attorney at the time of the bankruptcy filing in 2013.

6/18/13 – Brett Bodie, Winzenburg's attorney, sends Gans an email that Ms. Winzenburg will probably file a bankruptcy in the near future. [ex. 8]

7/8/13 – Gans signs a request for an abstract of judgment in the superior court case. [ex. 13] This was before the judgment was entered and it appears that it was lodged and then was completed by the court simultaneously with the judgment.

7/19/13 – The Santa Barbara Superior Court enters a default judgment against Ms. Winzenburg in the amount of $25,498.21 and the abstract of judgment is issued that same date. [ex. 13, 103]

9/10/13 – A certified copy of the Abstract of Judgment is issued by the superior court. [ex. 103] On or after September 10, Gans mails this to the Ventura and Santa Barbara Country Recorders.

9/18/13 – Ms. Winzenburg files bankruptcy. Carl Gans and Eric Gans are listed on schedule F.

9/20/13 – Abstract recorded in Ventura County [ex. 13, 103]

9/21/13 – BNC mails notice of the bankruptcy to Eric Gans and to the Estate of Carl Gans. [ex. 14]

When notice is received, Eric instructs his staff to cease all collection actions, which they did.

12/30/13 – Winzenburg receives her discharge in bankruptcy. [ex. 15]

Jan. 2014 Eric moves his office from 1216 State St., 6th floor, Santa Barbara 93101 to 1220 State St., 2d floor, Santa Barbara 93101.

1/1/14 – BNC notice of discharge is mailed to Eric Gans and the Estate of Carl Gans at 1216 State St. 6th floor, Santa Barbara. [ex. 15]

April or May 2019 – Winzenburg begins a refinance transaction for the property on Calle Jazmin.

5/20/19 – Eric Gans sends a payoff demand for $40,386.90 plus accruing interest to Maria Sarwary, escrow officer at Foundation Escrow Co. [ex. 16]

Late May through early June 2019 – Elise Boyer (aka Elise Gilliam) at American Mortgage Bank negotiates a reduced payoff demand by Gans. At first Winzenburg offers $2,500, the purported settlement amount that Carl Gans had agreed to, but that is not accepted by Eric Gans. [ex. 4]

6/3/19 – Winzenburg makes an offer through Boyer of $5,000 to settle with Gans. [ex. 4]

6/6/19 – Gans counteroffers via Boyer for $7,500, which Winzenburg accepts. [ex. 4]

6/6/19 – At the request of Boyer, Gans signs an Acknowledgement of Satisfaction and (apparently) a revised payoff demand of $7,500. [ex. 10, 121; ex. 107, which was identified and discussed but never moved into evidence.]

Between 6/6 and 6/17/19 – Winzenburg contacts Brett Bodie, her bankruptcy attorney, and finds out that the Gans debt was included in her bankruptcy schedules and later it was discharged. [ex. 5]

6/17/19 – Gans receives a copy of Winzenburg's bankruptcy discharge. [ex. 5]

6/?/19 – Brett Bodie, Winzenburg's bankruptcy attorney, phones Gans and explains about the purported violation of the automatic stay and that the recording of the abstract was void and not voidable. This was a confrontational interchange.

6/21/19 – Gans states to Elise Boyer, the mortgage broker, that he will cooperate. [ex. 5, 108]

6/24/19 – Boyer offers to draft the lien release. [ex. 5, 108]

6/25/19 – Gans tells Boyer to draft the lien release, which he will review and sign.  That afternoon Gans receives the lien release from Boyer. [ex. 5, 108]

6/28/19 – Gans tells Boyer he wants the reason for the release to state that it is due to the bankruptcy discharge, not that the judgment was paid in full.  He asks Boyer to have Winzenburg's bankruptcy attorney prepare the appropriate documents. Boyer states that she will ask the title company to prepare them. [ex. 5, 108]

7/1 through 7/9/19 – Apparently Boyer did not make changes to the release form, but kept asking Gans to sign it. [ex. 5].

7/9/19 – Gans refuses to sign the release unless it acknowledges that the judgment was wiped out by the bankruptcy. [ex. 5]

7/10/19 – Boyer suggests a payment of $500 for a partial satisfaction and Gans agrees. But the title company says that this will not release the balance of the lien. [ex. 5]

Mid-July 2019 – Gans and his family fly to Washington State for vacation and stay in a somewhat remote area.

7/15/19 – Boyer sends Gans a document with satisfactory language. [ex. 5]

ca. 7/12/19 [exact date unknown] – Docusign sends Gans an Acknowledgement of Satisfaction. [ex. 109]  Gans is on the road, but pulls over and signs the Docusign Acknowledgement of Satisfaction.  It is not notarized. This is probably exhibit 9, which also included a demand for $1,000.

7/15/19 – Charley Oxton, who shares a suite with Gans and has an association of practice with him [the Court takes judicial notice of the website for http://oxtonstaabgans.com], writes Boyer that "Mr. Amini [from American Mortgage

-4-

Bank] spoke with our office Paralegal, Thelma, last week wherein he promised to pay Mr. Gans a one-time payment of $1,000 for his Father's Estate. Can you please confirm this promise and understanding? I will then e-mail you the aforementioned document, please let me know, thank you." [ex. 6] Boyer tells Oxton that she will "edit the 'zero demand' to reflect $1,000 vs. $0." She states that she needs the form signed and notarized and that she will send a notary to Gans' office. Oxton asks the deadline and Boyer responds that this document is the last one needed to close the refinance escrow, so there is a rush. Oxton informs Boyer that Gans is "out of the office until Wednesday" June 17. [ex. 6]

7/16/19 – Oxton checks with Gans and then tells Boyer that the notary can come to the office on Wednesday, June 17 at 9:30 a,m,. 11:00 a.m., or anytime after 3:00 p.m. Boyer sets up a notary to come to Gans' office on Wednesday, June 17 at 9:30 a.m. [ex. 6]

7/16 or 7/17/19 – Gans returns to Santa Barbara by air.

7/17/19 – Gans signs the Acknowledgement of Satisfaction before a notary. Gans send the Acknowledgment of Satisfaction and a demand for $1,000 to Foundation Escrow. [ex. 113]

Thereafter in July 2019, Ms. Winzenburg withdrew her request for the refinance for a combination of personal reasons and because she did not like the terms of the loan.

12/20 – Winzenburg begins another refinance and the title company finds the Gans judgment lien. The title company requests a payoff demand.

1/20/21 - Gans sends a copy of the previously signed and notarized Acknowledgement of Satisfaction [ex. 113] to Gilbert Valdez, the current loan broker. [ex. 115]. But the title company needs the original, which Gans had sent to Foundation Escrow. Gans tells them to get it from the file of the prior title company.

1/21/21 – First American Title Company, the prior title company, does not have the original Acknowledgement of Satisfaction (and may never had had it because Winzenburg had cancelled the refinance before it closed). [ex. 116]

In January 2021 – Winzenburg comes to Gans' office and asks to make a $1,000 payment. His staff talks to her and she charges $1,000 on a credit card. Gans passes this on to his mother as beneficiary of the Estate of Carl Gans. Although she has not been asked to make any payment since the July 2019 communications, Winzenburg believes that this payment is necessary to get Gans to sign an updated Acknowledgement of Satisfaction.

3/10/21 – Winzenburg hires Bodie to try to convince Gans to record an Acknowledgement of Satisfaction of Judgment.

3/11/21 – Bodie leaves Gans a detailed voice mail that the bankruptcy avoided the lien and that any collection was a violation of the stay and the discharge. Gans calls back. They have a hostile exchange including about the return of the $1,000. Gans refuses to refund the money stating that it was not an improper collection effort. [ex. 11]

4/2/21 – the OSC motion is filed. [dkt. 20]

4/9/21 – Gans writes Bodie that there was not and had not been a collection attempt since he learned of the discharge and that he will sign any necessary documents to the effect that his father's estate asserts no rights against the property. [ex. 117]  Ahern Tiller, who is Brett Bodie's colleague at the Bankruptcy Law Center in Ventura, sends Gans a demand to refund the $1,000 and provide the documents. [ex. 118]

4/12/21 – Gans speaks to Winzenburg's mortgage representative and emails Tiller that the mortgage representative says that the escrow may have already closed. [ex. 119]

4/12/21 – TIller demands that Gans prepare a release of the judgment, sign and notarize it, record it in Ventura County, and send Winzenburg a $1,000 check with a copy to Tiller. [ex. 120]

4/22/21 – Gans files an Acknowledgement of Satisfaction of Judgment in the superior court. [ex. 121]

4/29/21 – Gans has the Acknowledgement of Satisfaction of Judgment recorded. [ex. 121]

5/20/21 – Initial hearing on OSC; continued to 6/24/21 for an evidentiary hearing.

5/21/21 – Gans sends a $1,000 check to Winzenburg. [ex. 122]

5/26/21 – Gans calls Bodie to discuss the OSC. [ex. 12]

6/21/21 – refinance closes [per testimony of Ms. Winzenburg]

## **CONCLUSIONS OF LAW**

### AUTOMATIC STAY

The motion contends that Gans violated the automatic stay because the Abstract of Judgment was recorded two days after the bankruptcy was filed.  It is true that the recording is void because of the automatic stay, but the date of the physical recording was not an intentional act of Gans.  The abstract was issued on September 10, 2013 and Gans testified that it was mailed to the Ventura County Recorder on or after that date.  Once it was out of his hands, he has no responsibility for the filing.  And even if he had personally delivered it to the county recorder on September 20, the notice of bankruptcy was not mailed to him until September 21.  Thus there can be no sanctions concerning the recording of the Abstract of Judgment.

### DISCHARGE INJUNCTION

#### The Law

The actual issue in this motion is whether there was a violation of the discharge injunction in that the Abstract of Judgment was not released in a timely fashion.  The existence of an injunction that is created upon the entry of an order of discharge is set forth in 11 USC §524, which states:

> a) A discharge in a case under this title [11 USCS §§ 101 et seq.]—
> (1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1192, 1228, or 1328 of this title [11 USCS § 727, 944, 1141, 1192, 1228, or 1328], whether or not discharge of such debt is waived;
> (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived ….

When Ms. Winzenburg received her discharge on December 30, 2013, her personal liability reflected in the Superior Court judgment terminated and thus the Abstract arising from that liability and judgment was also voided and ineffective. Section 524(a)(2) enjoins any continuation of an action to recover or offset that debt. The movant contends that Eric Gans' delays in releasing the recorded abstract by providing a signed and notarized Satisfaction of Judgment was a violation of the discharge stay.  She also argues that she was required to pay Gans $1,000 of the judgment debt so that he would sign the necessary papers.  This is also a violation as it is a recovery on the discharged debt.

The proper remedy for both violations of § 524(a) is done through a motion for contempt, by virtue of the court's powers set forth in §105 as well as the court's inherent powers.  *Barrientos v. Wells Fargo Bank, N.A.,* 633 F.3d 1186 (2011)

The standard in the Ninth Circuit for determining a motion for civil contempt due to violation of the discharge injunction is set forth in *ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.),* 450 F.3d 996,1007 (9th Cir. 2006):

> A party who knowingly violates the discharge injunction can be held in contempt under section 105(a) of the bankruptcy code. See *In re Bennett*, 298 F.3d at 1069; *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir. 2002) (holding that civil contempt is an appropriate remedy for a willful violation of section 524's discharge injunction). In Bennett, we noted that the party seeking contempt sanctions has the burden of proving, by clear and convincing evidence, that the sanctions are justified. We cited with approval the standard adopted by the Eleventh Circuit for violation of the discharge injunction: "[T]he movant must prove that the creditor (1) knew the discharge injunction was applicable and (2) intended the actions which violated the injunction." *Bennett*, 298 F.3d at 1069 (citing *Hardy v. United States (In re Hardy),* 97 F.3d 1384, 1390 (11th Cir. 1996)).

This is expounded on by the Ninth Circuit BAP in *Desert Pine Villas Homeowners Ass'n v. Kabiling (In re Kabiling),* 551 B.R. 440, 445 (9th Cir. BAP 2016):

> The debtor has the burden of proving, by clear and convincing evidence, that the offending creditor knowingly and willfully violated the discharge injunction. *ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.),* 450 F.3d 996, 1007 (9th Cir. 2006). The offending creditor acts knowingly and willfully if (1) it knew the discharge

injunction was applicable and (2) it intended the actions which violated the injunction. Id.

With respect to the first prong, a creditor cannot be held in contempt for violating a discharge injunction unless it has actual knowledge of the injunction, which is a question of fact. *ZiLOG*, 450 F.3d at 1008. If the creditor disputes that it had such knowledge, an evidentiary hearing is required. Id. Actual knowledge of the discharge injunction does not end the inquiry, however, as the creditor also must be aware that its claim against the debtor was subject to the discharge injunction. *Emmert v. Taggart (In re Taggart)*, 548 B.R. 275, 288 (9th Cir. BAP 2016).[1] "Whether a party is aware that the discharge injunction is applicable to his or her claim is a fact-based inquiry which implicates a party's subjective belief, even an unreasonable one." Id.

With respect to the second prong, courts employ the same analysis regarding violations of the discharge injunction as they do with violations of the automatic stay. Id. The focus is on whether the creditor's conduct violated the injunction and whether that conduct was intentional; it does not require a specific intent to violate the injunction. *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1191 (9th Cir. 2003) (citing *Hardy v. United States (In re Hardy)*, 97 F.3d 1384, 1390 (11th Cir. 1996); and *Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 191 (9th Cir. 1995)).

As to the level of sanctions, while the violation of the automatic stay does allow for punitive sanctions, there is a dispute as to whether punitive sanctions can be used as a remedy for violation of the discharge stay. *Duby v. United States (In re Duby)*, 451 B.R. 644 (1st Cir. BAP, 2011) allows punitive damages as part of the general civil contempt powers of the bankruptcy court. *In re Andrus*, 184 B.R. 311, 1995 Bankr. LEXIS 1024 (Bankr. N.D. Ill.), aff'd, 189 B.R. 413, 1995 U.S. Dist. LEXIS 17628 (N.D. Ill. 1995) does not.

The Supreme Court has ruled in *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1801 (2019) that the objective standard is used to determine whether the party committed civil contempt in violating the discharge injunction:

> This standard is generally an objective one. We have explained before that a party's subjective belief that she was complying with an order ordinarily will not

---

[1] The BAP opinion in *Emmert V. Taggart* was appealed to the Ninth Circuit and affirmed. That affirmation was appealed to the Supreme Court, which reversed in part as to use of the subjective standard. *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1801 (2019)

insulate her from civil contempt if that belief was objectively unreasonable. As we said in *McComb v. Jacksonville Paper Co.*, 336 U. S. 187, 69 S. Ct. 497, 93 L. Ed. 599 (1949), "[t]he absence of wilfulness does not relieve from civil contempt." Id., at 191, 69 S. Ct. 497, 93 L. Ed. 599.

We have not held, however, that subjective intent is always irrelevant. Our cases suggest, for example, that civil contempt sanctions may be warranted when a party acts in bad faith. See *Chambers v. NASCO, Inc.,* 501 U. S. 32, 50, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). Thus, in *McComb*, we explained that a party's "record of continuing and persistent violations" and "persistent contumacy" justified placing "the burden of any uncertainty in the decree . . . on [the] shoulders" of the party who violated the court order. 336 U. S., at 192-193, 69 S. Ct. 497, 93 L. Ed. 599. On the flip side of the coin, a party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction. Cf. *Young v. United States ex rel. Vuitton et Fils S. A*., 481 U. S. 787, 801, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987) ("[O]nly the least possible power adequate to the end proposed should be used in contempt cases" (quotation altered)).

These traditional civil contempt principles apply straightforwardly to the bankruptcy discharge context. The typical discharge order entered by a bankruptcy court is not detailed. See supra, at 2-3. Congress, however, has carefully delineated which debts are exempt from discharge. See §§523(a)(1)-(19). Under the fair ground of doubt standard, civil contempt therefore may be appropriate when the creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order or the statutes that govern its scope.

## APPLICATION OF THE LAW TO THE FACTS

The legal standard is clear and convincing evidence.  Also the Court must make an objective determination, though subjective intent can be considered and may impact the decision of an appropriate sanction.

### Signing a Satisfaction of Judgment

Prior to learning of the discharge, Gans had no reason to release the lien.  Just because someone files bankruptcy does not mean that s/he will actually receive a discharge.  The case could be dismissed or discharge could be denied.

-10-

It is highly likely that while Gans received the BNC notice of the entry of discharge.  But because it was around the time that he was moving his office, there is no evidence that he was aware of it. Although the move was only a few doors down the street, the notice may well have been lost in the crowd of papers that often exists in a move.  It appears that it was not placed in the case file.  Even if he had seen it in 2014, there is no reason to think that he would remember it some five years later when Winzenburg began her refinance process. Further, even if he had seen the notice of the discharge in 2014, it is not unusual for a judgment creditor (particularly one who is unsophisticated in bankruptcy law) to fail to unilaterally remove a judgment lien.  They tend to wait until a demand is made by the judgment debtor before they start to remove the lien.

Once the demand was made and Gans became aware of the discharge, he no longer tried to enforce the lien by asking for full or partial payment on the debt – at least not until June 2019.  This is discussed below.

As to the issue of intentional delay, this was a comedy of errors.  Boyer volunteered to draft the lien release and Gans accepted her offer.  A few days later, perhaps after he saw the first draft that Boyer created, Gans asked Boyer to have Winzenburg's bankruptcy attorney prepare the documents.  For some unknown reason she did not do so. Rather she tried to get the title company to create them.

Gans was not unreasonable when he refused to sign a document that was incorrect on its face.  The judgment had not been paid in full or at all.  It was being released as a matter of law due to the discharge.  The lien could be vacated either by order of the bankruptcy court or, apparently, by recording a document stating that the debt was discharged.  Since no one has presented the Court with the law as to the language needed in an Acknowledgement of Satisfaction, I will not rule on whether the original demands of the title company or Boyer were justified.  However, had Ms. Boyer done as Gans requested and had Bodie prepare the documents, the lien would have been released in June of 2019 without delay.

But in June 2019, Gans did sign a notarized Acknowledgment of Satisfaction and had every reason to believe that the lien was released and he would never hear about this again. But – through no fault of Gans – this was not recorded and there is no evidence of the current location of the original which Gans had sent to the escrow company.

Skipping ahead, in 2021 Ms. Winzenburg began a new refinance procedure and, once again, Mr. Gans was required to sign a notarized Acknowlegement of Satisfaction of Judgment. At this point it would have been easy for him to create a new original document from his copy of the one that he had signed on July 17, 2019 and send that to the new loan broker. But, instead, Gans got stubborn and insisted that they locate the original that he had signed some 18 months earlier. It is clear that he was irritated by the process that had occurred. And the Court finds that this irritation was justified. Why did Boyer send him a document to be signed by docusign when Boyer had to know that it must be notarized if it is to be recorded? Why didn't she ask Winzenburg's attorney to prepare and file the necessary document(s)? What happened to the Satisfaction of Judgment that Gans signed was notarized on June 17, 2019?

Yes, Gans was demanding as to language, but the 2019 delays could have been avoided if the process to obtain the necessary documentation had been put in the hands of a bankruptcy professional – namely Ms. Winzenburg's attorney.

As to the contentions of which attorney was rude on the phone calls, it is not relevant. It would have been professional to be courteous, but there is no law that says that one must.

2019 Demand for $1,000

Looking at the 2019 demand for $1,000, it is clear that due to the delays and repetitious requests and futile settlement negotiations, Gans got irritated. Gans assertsd that the $1,000 was demanded in mid-June 2019 as a "fee" because he had to come in early from vacation to sign the notarized Acknowledgement of Satisfaction [ex. 119 and Gans testimony at the hearing]. However this is not supported by the evidence. The

chain of emails shows that Charley Oxton, a suite-mate of Gans and one who somehow shares a practice with him, made the $1,000 demand even before Winzenburg's agent told him that the papers had to be signed immediately so that the escrow could close. [ex.6]

It is clear that the story about having to interrupt his vacation is fabricated and was created after he was challenged by Mr. Bodie to return the $1,000. [ex. 119]  As noted above, on Monday, July 15 at 3:56 pm Mr. Oxton emailed Ms. Boyer (with a copy to Gans and two other people from the refinance company) that in the prior week an employee of the refinance company promised "to pay Mr. Gans a one-time payment of $1,000.00 for his Father's Estate." Ms. Boyer confirmed this in her email of July 15 at 4:03 pm and said that "I will edit the 'Zero Demand' to reflect $1,000 vs. $0."  It was only after receiving this confirmation that Oxton asked for the deadline and a few minutes later wrote that "Mr. Gans is out of the office until Wednesday [June 17].  The soonest we could get it notarized would be then." [ex. 6]

However the story later told by Gans is as follows:

> Some years ago, I received a request from Ms. Winzenburg, through an Escrow company, to execute documentation confirming the fact that we asserted no claim against the property, as part of what was described as an attempt by her to refinance.  I was on vacation at the time, but promised that I would execute the paperwork requested of me as soon as I returned from vacation.  We were told that an earlier effort to address this matter was important.  We were offered a payment of $1,000.00 to compensate me for interrupting my vacation in order to go back to the office and address the matter immediately.
>
> We did not request compensation of $1,000.00.  We didn't request compensation in any amount.  It was offered as incentive to me to interrupt my vacation, and spend the time addressing the matter on an expedited basis, rather than when I came back from vacation.  I agreed to do so.  I signed the paperwork requested of me. I sent the paperwork to Ms. Winzenburg and her escrow representative, just as requested….
>
> Then, a few months ago, Ms. Winzenburg came to my office, unannounced, and utilized a credit card to offer a payment of $1,000.00.  The assumption was, since no other explanation was offered, that this was the $1,000.00 compensation that

had been offered, and not paid years previous. [Ex. 119; this is basically identical to Mr. Gans testimony at the hearing]

The facts show that Gans and his family were in Washington State for some period of time and most likely flew home to Santa Barbara before June 17, perhaps on June 16.  While it is possible that the plane arrived early enough on June 17 so that Gans could get to his office for a 9:30 a.m. appointment, why would he take a chance by offering such an early hour if he was flying in that morning?  It is more likely that they actually arrived the day before.[2] Either way, Gans was back in Santa Barbara by the morning of June 17 and if he had "vacation" plans for the day, he did not describe them. In fact, he had Oxton tell Boyer that he would be "out of the office until Wednesday," but could be in the office on Wednesday to sign it at 9:30, 11:00, and after 3:00 pm.  He may have wanted to flake out at home with a vacation day, but he certainly did not have set plans that had to be changed and did not come back to town earlier than planned. Again, Oxton's email indicated that Gans would be back in the office on June 17, not that he would be in town and taking a vacation day.

Further, the $1,000 was a demand in escrow for the purposes of releasing the Abstract of Judgment filed in the Superior Court case 1417303 (Sterne) and not a separate request for payment. [Ex 113]

The demand made by Oxton to Boyer states that the $1,000 was for Gans' "Father's Estate."  When he received the money some 18 months later, Gans sent the $1,000 to his mother as the beneficiary of the Carl Gans Estate.  This was not a fee received for Gans' time and trouble.

---

[2] The Court takes judicial notice that Alaska Air, the most likely carrier, advertises its non-stop flight time at 2 hours, 23 minutes.  Seattle is a large airport and Mr. Gans testified that he had a rental car, which obviously had to be returned.  Also, it is normal for airlines to require that arrival at the terminal take place at least an hour before flight time.  Due to the car return, it would have to be considerably earlier.  Thus, unless the family took an overnight flight (and the Court does not know whether any such flights were available on June 18), they would have had to arrive at the Seattle airport at about 4:00 a.m. in order to land in Santa Barbara by 8:30 am and thus have enough time to pick up their luggage and drive to the office for a 9:30 notary appointment (even if Gans did not stop at home first to drop his family).

The Court finds that the demand for $1,000 was wrongful and, had the money been paid at that time, it would have been a violation of the discharge injunction. But the money was not paid in 2019 and the escrow failed to close solely due to Winzenburg's actions.

### 2021 Payment of $1,000

However, the 2021 refinance is more legally complicated. As to the payment of $1,000, there is no evidence that Gans demanded this. It appears that Winzenburg believed that it was required due to the demand from some 18 months before and that it was necessary to ensure that Gans would sign a new Acknowledgement of Satisfaction and so that he would stop insisting that the old one (which he had sent to Foundation Escrow [Ex. 113] be located and used. However, from Gans viewpoint, it was payment on the debt owed to his father, which is shown because he testified that he sent it to his mother as the beneficiary of the Carl Gans Estate. While voluntary payments on discharged debts are not a violation of the discharge injunction, this was not because Ms. Winzenburg felt a moral obligation to pay something on the amount owed on her prior attorney fees. It was a direct result of Gans' demand for payment in June 2019.

Putting together the fabrication as to the 2019 demand with the fact that Gans gave this $1,000 to his mother as the beneficiary of the Estate of his late father, it is both clear and convincing that Gans' actions meet the requirements described in *Zilog* and in *Bennett*. Gans certainly knew that the discharge injunction was applicable and he intended the demand and later the acceptance of the $1,000 as partial payment on the debt owed his father, which was the basis of the state court judgment.

Once Bodie made a demand that the $1,000 be returned, Gans should have done so. Instead he refused and – at some point – made up the story about his vacation interruption and also about not knowing why Winzenburg paid the money. In fact, he never admitted the real circumstances and when Gans returned the $1,000 after the initial hearing on this motion, he did not admit the violation. He stuck to his story until the end.

As noted, the 2019 demand was only the first step in the violation. Since no money was paid, the matter would have ended there. Once Winzenburg paid the $1,000, had Gans immediately returned it, the matter would have ended there. Even if he had returned it when Bodie made a demand, the matter would have ended there. But Gans kept the money and did not return it until after the OSC was filed and there had been an initial hearing on it. Gan kept insisting that it was not an improper payoff demand. By the time that the OSC was filed, he had been notified by Winzenburg's attorney that he must return the money, but he failed to do so – creating the fictitious story about his 2019 vacation interruption. In fact, Gans did not return the money until after he had been served with the OSC, received two post-OSC demands from Tiller that he do so, and there was an initial hearing on the OSC. Thus, while he should have immediately returned the $1,000 on receipt in January 2021, his delay until March 11 might be excused. But he was clearly on notice from that date forward and he delayed until May 21, 2021 before he refunded the money. This is a violation of the discharge injunction and it meets the first prong in that he was fully aware of the discharge and the injunction and it also meets the second prong in that his conduct violated the injunction, and his conduct was intentional.

But now we get into the subjective portion, which can be used to modify the sanction awarded. Again, the entire determination is based on clear and convincing evidence. While the Court is certain that the Oxton demand for the $1,000 had nothing to do with Gans returning to the office early, it is possible that it may actually have been due more to Gans' frustration over the delays in getting a signed document that was acceptable to both him and the title company. In Gans' mind it may really have been compensation for all of the calls with Boyer, the interruption of his vacation to sign the ineffective docusign Satisfaction of Judgment, and the demand to do it all again. Unfortunately, the timing of the communications in June 2019 colors Mr. Gans' good faith and credibility.

## **RULING**

So where do we go from here?  It appears that Ms. Winzenburg suffered no actual damage from the delay either time. She did not pay $1,000 in June 2019, the Acknowledgement of Satisfaction of Judgment was timely signed, and the escrow did not close due to the decision of Ms.Winzenburg and not as a result of any action or inaction of Mr. Gans.

As to the 2021 escrow, although Ms. Winzenburg asserts that her interest rate went up by ½ percent, this could not have been due to the delays of Mr. Gans in signing and recording the documents in the last weeks of April 2021 because the refinance did not close until June 21, 2021, some two months later.  Mr. Gans did not delay the escrow and there are no reasonable scenarios that the delay in closing was because he did not immediately return the $1,000, because he did refund it about a month before the closing actually took place.

Therefore, the Court has no evidence of actual damages to Ms. Winzenburg other than, perhaps the attorney fees for bringing the OSC.  Now we get into the question of what is reasonable given the circumstances of this case.  Because the movant put forth no evidence of damages at the evidentiary hearing, the Court continued this to January 25, 2022 at 10:00 a.m. for that issue.  In preparation for that hearing, Bankruptcy Law Center is to file and serve their time records and invoices by January 11.  Should Mr. Gans wish to file a written response before the hearing, he may do so by January 18, but he can decide to wait until the hearing to orally argue the reasonableness of the damages. However, this Court intends to review the movant's submission and prepare a tentative ruling before the hearing.

Although the attorneys on both sides are quite hostile to each other, the Court urges them to try to reach a settlement on this. In looking at the issues, you might consider the following:

(1) That at some point it became clear that the automatic stay was not violated and thus any damage from that assertion did not exist

(2) That prior to the first hearing on the OSC, Gans released the Abstract and immediately after the hearing he refunded the $1,000

(3) That Ms. Winzenburg suffered no compensable damages

(4) That punitive damages are seldom allowed and that this does not appear to be egregious behavior

(5) That there was no justification for Mr. Bodie to remain at the November 23 hearing once he had testified.

###

Date: December 21, 2021

Geraldine Mund
United States Bankruptcy Judge